# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

\*\*\*

MGM RESORTS INTERNATIONAL,

                 Plaintiff,

vs.

UNKNOWN REGISTRANT OF
WWW.IMGMCASINO.COM,

                 Defendant.

Case No. 2:14–cv–1613–GMN–VCF

**REPORT & RECOMMENDATION**

MOTION FOR DEFAULT JUDGMENT AND
PERMANENT INJUNCTION (#18)

      This matter involves MGM Resorts International's trademark-infringement action against the unknown registrant of www.imgmcasino.com. *See* (Compl. (#1) at ¶¶ 24–29[1]). Before the court is MGM's Motion for Default Judgment and Permanent Injunction (#18). For the reasons stated below, MGM's motion should be granted.

## BACKGROUND

      The MGM Grand is a resort hotel and casino located on the Las Vegas Strip. (Compl. (#1) at ¶ 7). It features 6,852 guestrooms, 171,500 square feet of gaming space, five outdoor pools, luxury shopping, a spa and salon, the Cirque du Soliel's Kà show, world-renowned restaurants, lounges, a wedding chapel, expansive convention and meeting room space, nightclubs, and other amenities and attractions. (*Id*.)

      Since 1973, MGM Resorts has continuously offered a wide variety of premium goods and services, including casino services, under the "MGM" trademark. (*Id*. at ¶ 8). Someone else, however, set up an English and Chinese language website, www.imgmcasino.com, and used the MGM mark to offer casino services online. (*See id*. at ¶¶ 15–23). The website offers specific online casino games, like baccarat.

---

[1] Parenthetical citations refer to the court's docket.

roulette, and various forms of card and dice games, and purports to allow visitors to participate in live casino games being played at a casino in Cambodia (*Id*. at ¶ 19).

MGM alleges that this conduct violates the Lanham Act, 15 U.S.C. § 1125(d), which prohibits a person from, *inter alia*, using another's registered trademark for profit. MGM commenced this action on October 1, 2014. The registrant of the allegedly infringing website was served, "is believed to be a foreign [national]" residing in Panama, and has failed to plead or otherwise defend. *See* (Mot. of Alt. Service (#13) at 1:26–7); (Summons #15); (Mot. Default J. (#18) at Ex. C). On March 18, 2015, the clerk of court entered default against the registrant. (Doc. #17). Now, MGM moves for default judgment and requests a permanent injunction.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 governs default judgment. It states that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a). After the Clerk of Court enters a default, the plaintiff must petition the court to obtain a default judgment. FED. R. CIV. P. 55(b)(2).

Before considering whether default judgment should be entered, the court has "an affirmative duty" to ensure that it has personal jurisdiction over the defaulted defendant and subject-matter jurisdiction over the plaintiff's action. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) (citing *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1203 (10th Cir. 1986)). A judgment without jurisdiction is void. *Id*. (citations omitted).

If jurisdiction exists, the court's decision to enter default judgment is discretionary. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *see also Heidenthal*, 826 F.2d at 917 ("Rule 55 gives the

court considerable leeway as to what it may require as a prerequisite to the entry of a default judgment.").[2] Generally, the court accepts the factual allegations in the plaintiff's complaint as true but requires the plaintiff to prove damages. *Televideo Video Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).

The Ninth Circuit has adopted seven factors that courts "may" consider when adjudicating a motion for default judgment. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986) (citing 6 MOORE'S FEDERAL PRACTICE ¶ 55-05[2], at 55-24 to 55-26). The factors are: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72 (applying four of the seven factors).

## DISCUSSION

The court must engage in three inquiries when recommending default judgment against Defendant: (1) whether the court can enter default judgment (*i.e.*, does jurisdiction exist?); (2) whether the court should enter default judgment (*i.e.*, do the *Eitel* factors favor MGM?); and (3) whether MGM has proven entitlement to permanent injunctive relief and damages. Each inquiry is addressed below.

## I.    <u>Whether Jurisdiction Exists</u>

The court's analysis of MGM's motion begins with jurisdiction. *In re Tuli*, 172 F.3d at 712. When examining a motion for default judgment, the court has "an affirmative duty" to ensure that it has personal jurisdiction over the defaulted defendant and subject-matter jurisdiction over the plaintiff's action. *Id*. Generally, jurisdictional allegations must be plausible. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir.

---

[2] Federal Rule of Civil Procedure 54(c) limits the court's discretion in one respect. It states that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

2014) *cert. denied*, 14-119, 2014 WL 3817554 (U.S. Oct. 14, 2014). However, on a motion for default judgment, the court accepts the plaintiff's allegations as true. *Heidenthal*, 826 F.2d at 917–18. As discussed below, the court finds that it has subject-matter jurisdiction over MGM's action and personal jurisdiction over Defendants.

### A.   *Subject-Matter Jurisdiction*

MGM predicates the court's subject-matter jurisdiction on 28 U.S.C. § 1331, which grants district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." MGM's complaint seeks relief under the Lanham Act, 15 U.S.C. § 1125(d), which is a law of the United States. *S. California Darts Ass'n v. Zaffina*, 762 F.3d 921, 926 (9th Cir. 2014). Additionally, the Lanham Act itself "grants the federal district courts original jurisdiction over all actions arising under it." *Id.* (citing 15 U.S.C. § 1121(a)); *see also Steele v. Bulova Watch Co*., 344 U.S. 280, 286 (1952) (stating that the Lanham Act creates a "broad jurisdictional grant"). The pertinent part of MGM's complaint is based on the provision of the Lanham Act codified at 15 U.S.C. § 1125, which "protects against infringement of unregistered marks and trade dress as well as registered marks."

In a typical trademark-infringement action, the court's subject-matter inquiry would end here. Because this case involves[3] the extraterritorial application of the Lanham Act—(*i.e.*, "application of the Act to activity (such as sales) of a defendant outside the territorial boundaries of the United States")—an additional inquiry is necessary. *McBee v. Delica Co*., 417 F.3d 107, 116 (1st Cir. 2005); *see also Reebok Int'l, Ltd. v. Marnatech Enters*., 970 F.2d 552, 554–57 (9th Cir. 1992); *Wells Fargo & Co. v. Wells Fargo Exp. Co*., 556 F.2d 406, 430 (9th Cir. 1977).

---

[3] *See* (Doc. #13 at 1:26–7) ("Defendant is believed to be a foreign entity"); *see also* (Doc. (#18) at Ex. C) (identifying the registrant as a resident of Panama).

4

"It is a general principle that one state cannot require a person to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national, nor can the person be required to refrain from an act that is required." *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1392 (9th Cir. 1995) (internal quotation marks omitted) (quoting RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 441(1)(a) (1987)). And, it is a longstanding principle of American law that Congressional enactments "apply only within the territorial jurisdiction of the United States," unless "a contrary intent appears." *Equal Emp't Opportunity Comm'n v. Arabian Am. Oil Co*., 499 U.S. 244, 248 (1991).

The Supreme Court has determined that the Lanham Act may reach extraterritorial conduct, but it has not established a test governing the Act's extraterritorial application. *Id*. at 252–53; *Steele v. Bulova Watch Co*., 344 U.S. 280 (1952). The circuit courts have established a variety of tests for determining when extraterritorial application of the Lanham Act is appropriate. *See McBee*, 417 F.3d at 117 (collecting cases). In the Ninth Circuit, courts apply a "rule of reason" test that requires the plaintiff to show (1) some effect on United States commerce, (2) an effect that is sufficiently great to be a cognizable injury to plaintiff under the Lanham Act, and (3) the interests and links to American commerce must be sufficiently strong in relation to those of other nations to justify, in terms of comity, an extraterritorial application of the Act. *Star-Kist Foods, Inc. v. P.J. Rhodes & Co*., 769 F.2d 1393, 1395 (9th Cir. 1985) (citing *Timberlane Lumber Co. v. Bank of Am*., 549 F.2d 597 (9th Cir. 1977)).

The first two requirements are met here. The factual allegations of MGM's complaint are accepted as true, *Heidenthal*, 826 F.2d at 917–18, and state that (1) MGM "has spent millions of dollars advertising, marketing, and promoting its goods and services under the MGM mark since at least December 1, 1973," (2) Defendant's infringing domain name "lure[s] prospective gamblers to overseas online casinos not owned, operated by, approved of, affiliated with, or sponsored by MGM Resorts or the MGM Grand,"

and (3) Defendant's conduct caused MGM "to suffer, monetary loss and irreparable injury to its business, reputation, and goodwill." (Compl. (#1) at ¶¶ 8, 16, 29).

Courts routinely find that the sale of an infringing product in a foreign country, as alleged here, has a sufficient effect on commerce to invoke Lanham Act jurisdiction. *Reebok Intern., Ltd. v. Marnatech Enter., Inc.*, 970 F.2d 552, 554-55 (9th Cir. 1992); *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 503 (9th Cir. 1991) (finding subject-matter jurisdiction where the plaintiff lost "millions of dollars in revenues through trademark infringement").

The third requirement—(*viz.*, "the interests and links to American commerce must be sufficiently strong in relation to those of other nations to justify, in terms of comity, an extraterritorial application of the Act")—involves the balancing of seven factors:

> [1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the parties and the locations or principal places of business of corporations, [3] the extent to which enforcement by either state can be expected to achieve compliance, [4] the relative significance of effects on the United States as compared with those elsewhere, [5] the extent to which there is explicit purpose to harm or affect American commerce, [6] the foreseeability of such effect, and [7] the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614) (hereinafter: the *Timberlane* factors). The district court is not required to apply these factors in a rigid fashion or find that the factors unanimously favor extraterritorial application of the Lanham Act. If the vast majority of factors favor extraterritorial application, counterbalancing factors are of little import, even if a conflict with of law exists. *Reebok*, 970 F.2d at 557; *Aristocrat Tech., Inc. v. High Impact Design & Entm't*, 642 F. Supp. 2d 1228, 1238 (D. Nev. 2009).

The **first** *Timberlane* factor examines "the degree of conflict with foreign law or policy." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). Because Panama has trademark laws of its own, extraterritorial enforcement of the Lanham Act may conflict with Panamanian law. *See Reebok*, 970 F.2d

at 555. However, no conflict exists here. The Seventh Circuit determined that the Lanham Act may reach Panama. *See Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 813 (7th Cir. 1973). And, under the facts of this case, no conflict of law exists because MGM holds the rights to the MGM mark in Panama where MGM registered its rights with the Panama trademark office. *See* (Zhong Decl. (#20-1) at Ex. A). This factor weighs heavily in favor of extraterritorial application of the Lanham Act.

The **second** *Timberlane* factor considers "the nationality or allegiance of the parties and the locations or principal places of business of corporations." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). Here, MGM is a Delaware corporation with a principal place of business in Las Vegas, Nevada. (Compl. (#1) at ¶ 4). Defendant appears to reside in Panama and operate an English-language internet casino using MGM's mark. The court finds that MGM's connection to the United States militates in favor of extraterritorial application of the Lanham Act. *See, e.g.*, *Trader Joe's Co. v. Hallatt*, 981 F. Supp. 2d 972, 978 (W.D. Wash. 2013). The court also finds that Defendant's purposeful availment of the identity and registered trademark of a United States corporation through an interactive English-language website militates in favor of extraterritorial application of the Lanham Act. *See, e.g.*, *Cybersell, Inc. v. Cybersell, Inc.*, 130 F .3d 414, 420 (9th Cir. 1997) (holding that a defendant's operation of an interactive website militates in favor of a finding of specific jurisdiction in the trademark context).

Although *Cybersell* addressed personal jurisdiction, its underlying principles and policies are relevant to the second *Timberlane* factor. Both consider whether a defendant has sufficient minimum contacts to the United States to warrant the extraterritorial application of the Lanham Act. *Compare Cybersell, Inc.*, 130 F .3d at 420 *with Timberlane*, 549 F.2d at 614; *see also Trader Joe's Co.*, 981 F. Supp. 2d at 979 ("Although Pirate Joe's does not operate outside Canada, Hallatt's connections with the U.S. are likely sufficient to support extraterritorial jurisdiction."). Here, Defendant connected itself to the United States by posing as a United States corporation and establishing an interactive English-language

website to operate an online casino. The court finds that Defendant's website establishes a sufficient connection to the United States to justify extraterritorial application of the Lanham Act under the second *Timberlane* factor.

The **third** *Timberlane* factor examines "the extent to which enforcement by either state can be expected to achieve compliance." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). This factor weighs in MGM's favor. MGM seeks an injunction preventing Defendant from operating an online casino using MGM's mark. The website's registrar is located in the United States. (Compl. (#1) at ¶ 5). This fact gives a United States District Court a superior ability to achieve compliance with the United States' trademark laws. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 504 (9th Cir. 1991) (citation omitted) ("The injunction would be effective against [Defendant] because it is a U.S. corporation which 'orchestrated [its] infringing activities,' from the United States.").

The **fourth** *Timberlane* factor examines "the relative significance of effects on the United States as compared with those elsewhere." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). "Where the alleged infringement results in losses to a U.S. corporation, this factor tips in favor of extraterritorial application." *Aristocrat*, 642 F. Supp. 2d at 1237 (citing *Ocean Garden*, 953 F.2d at 504). There is no dispute that MGM has been harmed here. On a motion for default judgment, the complaint's allegations are taken as true. *Heidenthal*, 826 F.2d at 917–18. MGM's complaint alleges that "[t]he MGM mark is the embodiment of the substantial goodwill and excellent reputation MGM Resorts and its predecessors have developed for decades as a premier provider of entertainment and casino services." (Compl. (#1) at ¶ 22). MGM further alleges that "Defendant's blatant exploitation of MGM Resorts' trademarks without MGM Resorts' consent, MGM Resorts has lost control over the reputation and goodwill represented by the MGM mark." (*Id.*) This harm is legally cognizable. *See Coach Servs., Inc.*

8

*v. YNM, Inc.*, No. 2:10–cv–02326–JST (PLAx), 2011 WL 1752091, at *2 (C.D. Cal. May 6, 2011). Accordingly, the fourth *Timberlane* factor favors the extraterritorial application of the Lanham Act.

The **fifth** *Timberlane* factor examines "the extent to which there is explicit purpose to harm or affect American commerce." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). This factor considers whether Defendant's infringement was intentional. *Trader Joe's Co.*, 981 F. Supp. 2d at 979; *Aristocrat*, 642 F. Supp. 2d at 1238. Intentional conduct constitutes "an explicit purpose to harm American commerce" as a matter of law. *Aristocrat*, 642 F. Supp. 2d at 1238–39 (citing *Ocean Garden*, 953 F.2d at 504).

The circumstances of this case demonstrate the Defendant's appropriation of the MGM mark was intentional. It can be no coincidence that Defendant decided to create an online casino with the MGM mark. At this stage, the court takes as true MGM's allegation that its mark is world famous, unmistakable, and immediately associated with gaming. *Heidenthal*, 826 F.2d at 917–18 (stating that a complaint's allegations are taken as true on a motion for default judgment). In light of these allegations, the only reasonable inference is that Defendant's infringement was intentional. Accordingly, the fifth *Timberlane* factor favors the extraterritorial application of the Lanham Act.

The **sixth** *Timberlane* factor examines "the foreseeability of [a negative] effect" on American commerce." *Reebok*, 970 F.2d at 555 (quoting *Timberlane*, 549 F.2d at 614). If a defendant intentionally infringes a plaintiff's trademark rights, then the negative effect of infringement is foreseeable as a matter of law. *Aristocrat*, 642 F. Supp. 2d at 1238–39 (citing *Ocean Garden*, 953 F.2d at 504). Because the court found that Defendant's conduct was intentionally, it automatically follows that a negative effect was foreseeable. This factor favors MGM.

The **seventh** *Timberlane* factor examines "the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Reebok*, 970 F.2d at 555 (quoting

*Timberlane*, 549 F.2d at 614). MGM is a publically-traded United States corporation. The importance of Defendant's violation in the United States is, therefore, great. *Herb Reed*, 25 F. Supp. 3d at 1329 ("The violations are important within the United States because they impact American entities.").

Because all seven *Timberlane* factors favor the extraterritorial application of the Lanham Act, the court finds that it has subject-matter jurisdiction and may apply the Lanhan Act to Panama.[4]

### B.   *Personal Jurisdiction*

Next, the court considers whether it has personal jurisdiction over Defendant. A federal district court may only exercise personal jurisdiction over a defendant if two requirements are met. *Sec. & Exch. Comm'n v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) (citation omitted).[5] First, the court must have a basis for asserting jurisdiction. *Id*. That is, the plaintiff must satisfy the minimum-contacts test. *See id*. Second, the plaintiff must perfect the mechanism for asserting jurisdiction. *Id*. That is, the plaintiff must properly serve the defendant under Rule 4. *Id*. MGM satisfied both requirements.

### 1.   Minimum Contacts

With regard to the court's basis for asserting personal jurisdiction, the court may exercise specific personal jurisdiction over a nonresident defendant if three requirements are met. That is, (1) the defendant must have purposefully directed activities at a resident in the forum, (2) the plaintiff's claim arises from the defendant's forum-related activities, and (3) the exercise of jurisdiction over the defendant is reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002).

---

[4] MGM has not argued that the Lanham Act should be applied to Cambodia. The court makes not findings or recommendations with regard to Cambodia.

[5] A federal district court may also exercise personal jurisdiction over a defendant if the defendant waives the defense of insufficient service of process and lack of personal jurisdiction. FED. R. CIV. P. 12(h)(1). Because Defendant failed to plead or otherwise defend against MGM's claims, this basis is not relevant.

i.      *purposeful availment*

The first jurisdictional inquiry requires the court to determine whether Defendant "purposefully directed activities at a resident in the forum." *Rudzewicz*, 471 U.S. at 472. If, as here, a nonresident defendant intentionally harms a plaintiff in the forum, then the first prong of the court's jurisdictional inquiry is satisfied. *Mavrix Photo, Inc. v. Brand Tech., Inc*., 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Calder v. Jones*, 465 U.S. 783 (1984)); *see also supra* § I(A) at 7–8 (discussing the second *Timberlane* factor and finding that Defendant's conduct was intentional).

However, in the context of a trademark infringement action, the Ninth Circuit has held that when the operator of a passive website[6] conducted no act in the forum state other than the use of the trademark, the court would not exercise specific jurisdiction because doing so would result in "every complaint arising out of alleged trademark infringement" automatically resulting "in personal jurisdiction wherever the plaintiff's principal place of business is located." *Cybersell, Inc*., 130 F .3d at 420.

MGM's action is factually distinguishable from *Cybersell*. In *Cybersell*, the plaintiff relied on the fact that the defendant operated a website accessible in the forum state, which allegedly contained infringing trademarks. *Id*. at 416. The defendant's website advertised its services but did not allow parties

---

[6] The *Cybersell* adopted the distinction between "passive" and "active" websites that was articulated in *Zippo Mfg. Co. v. Zippo Dot Com, Inc*., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997):

> [Whether] personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well-developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal jurisdiction.

*Id*. (internal citations omitted); *see also* 4A C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1073.1 (3d ed.) (discussing personal jurisdiction, *Cybersell*, and the internet).

to transact business via the site:

> As part of their marketing effort, the Certos created a web page at http://www.cybsell.com/ cybsell/index.htm. The home page has a logo at the top with "CyberSell" over a depiction of the planet earth, with the caption underneath "Professional Services for the World Wide Web" and a local (area code 407) phone number. It proclaims in large letters "Welcome to CyberSell!" A hypertext link allows the browser to introduce himself, and invites a company not on the web-but interested in getting on the web-to "Email us to find out how!"

*Id.* at 415–16. Noting the lack of interactivity on the defendant's website, the court concluded that the defendant had "done no act and [ ] consummated no transaction, nor has it performed any act by which it purposefully availed itself of the privilege of conducting activities, in [the forum], thereby invoking the benefits and protections of [forum] law." *Id.*

Applying *Cybersell* and *Zippo*'s sliding scale analysis to the facts of this case, the court finds that it may exercise specific jurisdiction over Defendant. Defendant's website is highly interactive. By visiting the website located at <www.imgmcasino.com>, visitors are greeted by a homepage that displays the text "I-MGM ONLINE CASINO" and a lion figure, which is commonly associated with MGM's products and services. The website enables visitors to play casino games, including baccarat, roulette, and various dice and card games. (Compl. (#1) at ¶ 19). It also purports to allow visitors "to participate in live casino games being played at a casino located in Cambodia" and open individual financial accounts that are linked to the individual visitors' banks. (*Id.* at ¶¶ 19–20). The website is written in English and is aimed and U.S. consumers with, *inter alia*, CitiBank accounts, and Mastercard and VISA credit cards. The website also enables visitors to connect to the website through their Facebook and Twitter accounts.

These facts demonstrate that Defendant's website is essentially a storefront for U.S. consumers. It offers services and products that are normally associated with businesses operating on South Las Vegas Boulevard in Las Vegas, Nevada. Additionally, the website does not appear to contain any of the aspects that other courts have found persuasive when declining to exercise personal jurisdiction over a foreign

website.[7] Accordingly, Defendant's website meets the purposeful availment prong of the minimum-contacts test. *Quokka Sports, Inc. v. Cup Int'l Ltd.*, 99 F. Supp. 2d 1105, 1112 (N.D. Cal. 1999).

### ii.   forum-related activities

The second prong of the court's minimum-contacts test considers whether "the plaintiff's claim arises from the defendant's forum-related activities." *Rudzewicz*, 471 U.S. at 472. Where, as here, an in forum plaintiff's trademark rights are infringed by the operation of a defendant's website that is aimed as U.S. consumers, this prong is satisfied. *Quokka Sports*, 99 F. Supp. 2d at 1113.

### iii.   reasonableness

Finally, the court notes that the third prong—(*viz.*, whether the exercise of jurisdiction over the defendant is reasonable)—is satisfied. Where the first two prongs are met, the court presumes that the exercise of jurisdiction is reasonable and the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Rudzewicz*, 471 U.S. at 477. Because Defendant defaulted, this inquiry is moot. *See, e.g.*, *Mayweather v. Wine Bistro*, No. 2:13–cv–210–JAD–VCF, 2014 WL 6882300, at *5 (D. Nev. Dec. 4, 2014) (Dorsey, J.) ("Because The Wine Bistro and 2nd To None Entertainment have defaulted, this inquiry is moot.").

---

[7] Courts conducting a purposeful availment analysis consider what, if any steps a defendant takes to limit their website's jurisdictional reach. Factors that have limited, or that courts have discussed as limiting, a defendant's exposure to personal jurisdiction in foreign forums based upon a website include the following:

> (1) the use of disclaimers, such as that the website is intended for a limited audience; (2) statements posted on the website directed only at residents of a limited geographic area; (3) designing the site so that it will not interact with users of the forum state; (4) a self-description of or notice on the website to the effect that it is only "informational"; (5) the absence of evidence of the website being contacted by residents of the forum state; and (6) the use of forum-selection or choice-of-law agreements that specify a state other than the forum state selected by the plaintiff.

WRIGHT & A. MILLER, *supra*, at § 1073.1.

2. <u>Service under Rule 4</u>

In addition to satisfying the minimum-contacts test, MGM perfected the mechanism for asserting jurisdiction over Defendant. That is, MGM properly served Defendant under Rule 4. (*See* Docs. #14, #15). Therefore, the court finds that it may exercise personal jurisdiction over Defendant.

**II.    <u>Whether the *Eitel* Factors Favor Default Judgment</u>**

Because the jurisdictional requirements are satisfied, the court proceeds to the second question: whether the court should enter default judgment under *Eitel*. This decision is discretionary and informed by seven factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72; *Aldabe*, 616 F.2d at 1092. Each is addressed below.

**A.    *The First* Eitel *Factor***

The first factor—(*viz.*, the possibility of prejudice to MGM)—favors entering default judgment. MGM is a world-famous resort hotel and casino. (Compl. (#1) at ¶ 7). It features 6,852 guestrooms, 171,500 square feet of gaming space, five outdoor pools, luxury shopping, a spa and salon, the Cirque du Soliel's Kà show, world-renowned restaurants, lounges, a wedding chapel, expansive convention and meeting room space, nightclubs, and other amenities and attractions. (*Id.*) Since 1973, MGM has continuously offered a wide variety of premium goods and services, including casino services, under the "MGM" trademark in order to protect its brand and reputation. (*Id.* at ¶ 8).

Defendant has been served and notified of MGM's claims but has not plead or otherwise defended. This constitutes prejudice. *See PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("Potential prejudice to Plaintiffs favors granting a default judgment. If Plaintiffs' motion for

14

default judgment is not granted, Plaintiffs will likely be without other recourse for recovery."); *Coach Servs.*, 2011 WL 1752091, at *2 (finding that the first *Eitel* factor favored the plaintiff because the defendant infringed the plaintiff's trademark rights and thereby harmed the plaintiff's reputation). Accordingly, the first *Eitel* factor favors entering default judgment against Defendant.

### B.     *The Second & Third Factors*

The second and third *Eitel* factors—(*viz.*, the merits of MGM's claims and the sufficiency of its complaint)—also favor entering default judgment. To warrant default judgment, the complaint's allegations must be sufficient to state a claim upon which relief can be granted. *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (Kennedy, J.). MGM's complaint satisfies this standard because its claims "cross the line from conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

MGM's complaint states one claim for cybersquatting under the Lanham Act, as amended by the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). To state a claim for cybersquatting a plaintiff must allege that (1) the defendant has a bad faith intent to profit from another's trademark and either registers, traffics in, or uses that trademark in a domain name; (2) the plaintiff's mark was distinctive or famous at the time the domain name was registered; and (3) the domain name is identical or confusingly similar to the plaintiff's trademark. 15 U.S.C. § 1125(d)(1)(A); *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). Each element is addressed below.

1.     <u>Bad Faith</u>

The Lanham Act provides a non-exhaustive list of nine factors to be considered when determining whether a defendant acted in bad faith:

(I) the trademark or intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

15

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct.

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous.

15 U.S.C. § 1125(d)(1)(B)(i).

MGM has satisfied the bad-faith element for two reasons. First, the complaint alleges that "[t]he Defendant has registered, trafficked in, and/or used the <www.imgmcasino.com> domain in commerce." (Compl. (#1) at ¶ 25). This allegation is taken as true. *Heidenthal*, 826 F.2d at 917–18.

Second, four of the nine statutory factors show that Defendant acted in bad faith. The first factor— ("the trademark or intellectual property rights of the person, if any, in the domain name")—weighs in favor of a finding of bad faith. The record demonstrates that Defendant has no intellectual property rights in the MGM mark. Additionally, there is no indication Defendant previously operated a business using

16

the MGM mark. The website's "About" page indicates the website is affiliated with the domain name <www.unclelimcasino.com>. *See* (Chaparian Decl. (#8-3) at Ex. B). The webpage also states that the Defendant's parent company is Twin Happiness International Ltd. and that Defendant is operating in cooperation with the Poipet Resort Casino in Cambodia. (*Id.*) The MGM mark is neither the legal name of any of these companies nor is it used to otherwise refer to their businesses in any way. Accordingly, the first factor weighs in favor of a finding of bad faith.

The second and ninth factors—(*viz.*, "the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person" and "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous")—also weigh in favor of a finding of bad faith. Defendant's intent to divert consumers is apparent. The registered domain name is strongly suggests the website is sponsored or endorsed by MGM because it contains MGM's mark and name. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1179 (9th Cir. 2010) ("Sites like trademark-USA.com, trademark-of-glendale.com or e-trademark.com will also generally suggest sponsorship or endorsement by the trademark holder . . . ."). MGM's mark has been registered since 1973; Defendant registered the infringing domain in 2013, and used a privacy protection service to do so. (Zhong Decl. (#8-5) at Ex. A.). This strongly militates in favor of a finding of bad faith.

The fifth factor also weighs in favor of a finding of bad faith. This factor considers "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark." 15 U.S.C. § 1125(d)(1)(B)(i)(V). There is no doubt that Defendant intended to capitalize off of MGM's good will by diverting MGM's customers to the infringing domain name. The court accepts as true that the MGM mark is distinctive and world

famous, and that Defendant's website intended to usurp MGM's goodwill, fame, and reputation by redirecting internet users to the infringing domain. (Compl. (#1) ¶ 13).

### 2.   Inherently Distinctive Mark

The court also finds that MGM has satisfied second element. The complaint alleges that "Plaintiff's MGM mark was distinctive and/or famous when Defendant first registered, trafficked in, and/or used the <www.imgmcasino.com> domain name." (Compl. (#1) at ¶ 27). This allegation is taken as true. *Heidenthal*, 826 F.2d at 917–18. Additionally, because MGM's mark is a federally registered trademark it is presumed to be distinctive. *See* 15 U.S.C. §§ 1115(a) and 1057(b); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 876 (9th Cir. 1999) (holding "[]registration on the principal register creates a presumption of distinctiveness . . . .").

### 3.   Defendant Infringed the MGM Mark

MGM also satisfied the third element. The complaint alleges that "[t]he <www.imgmcasino.com> domain name is confusingly similar to Plaintiff's MGM mark, including Plaintiff's numerous domain names that feature the MGM mark, for example, <www.mgmgrand.com>." (Compl. (#1) at ¶ 26). This allegation is taken as true. *Heidenthal*, 826 F.2d at 917–18. Additionally, the use of "mgm" within the domain name <www.imgmcasino.com> is a self-evident reference to MGM that supports a finding of cybersquatting under the Lanham Act. *See Tabari*, 610 F.3d at 1179 ("Sites like trademark-USA.com, trademark-of-glendale.com or e-trademark.com will also generally suggest sponsorship or endorsement by the trademark holder . . . .").

Therefore, MGM's Motion for Default Judgment should be granted on its cybersquatting claim.

### C.   *The Remaining Four* Eitel *Factors*

The remaining four *Eitel* factors favor entering default judgment. The fourth factor considers the sum of money at stake in the action. *Eitel*, 782 F.2d at 1471–72. The question here is whether the damages

sought are proportional to the alleged harm. *Landstar Ranger, Inc. v. Parth Enter., Inc.*, 725 F. Supp. 2d 916, 921 (N.D. Cal. 2010). The Lanham Act states that plaintiffs in cybersquatting cases may elect an award of statutory damages at any time before final judgment is rendered in the amount "not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). MGM seeks the statutory maximum for the infringing domain name. This is proportional.

MGM's complaint plausibly alleges that Defendant's acts of cybersquatting were willful. MGM began using the MGM mark in 1973. Defendant did not begin using the "imgm" domain name until 2013. Defendant knows it is violation MGM's right because Defendant was served with a summons and a complaint and continues to operate the webpage. Accordingly, the fourth *Eitel* factor weighs in favor of entering default judgment against Defendant.

The fifth *Eitel* factor examines the possibility of a dispute concerning material facts. *Eitel*, 782 F.2d at 1471–72. There is little possibility of a dispute here. MGM's complaint is plausible under *Iqbal* and supported by screenshots, federal trademark registrations, Panamanian trademark registrations, and detailed allegations showing that Defendant infringed upon MGM's rights. (*See generally* Compl. (#1) at ¶¶ 6–18). This satisfies the fifth factor. *Wecosign, Inc.*, 845 F. Supp. 2d at 1082 ("Where a plaintiff has filed a well-pleaded complaint, the possibility of dispute concerning material facts is remote."); *Landstar Ranger*, 725 F. Supp. 2d at 921–22 ("Since [plaintiff] has supported its claims with ample evidence, and defendant has made no attempt to challenge the accuracy of the allegations in the complaint, no factual disputes exist that preclude the entry of default judgment.").

The sixth *Eitel* factor considers whether a defendant's default may have been the product of excusable neglect. *Eitel*, 782 F.2d at 1471–72. This factor favors default judgment where, as here, the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit.

*Landstar Ranger*, 725 F. Supp. 2d at 922; *see also* (Docs. #15) (demonstrating that Defendant was properly served with a summons and a complaint).

The final factor—(*viz.*, the strong policy favoring decisions on the merits)—also favors MGM. Defendant refuses to participate in litigation despite being served and having actual knowledge of MGM's claims. Rule 55 was designed to address this problem. *Landstar Ranger*, 725 F. Supp. 2d at 922. Where, as here, it is impossible to adjudicate an action on the merits because a defendant refuses to participate in litigation, the strong policy favoring decisions on the merits is outweighed by the need to finalize controversies in a timely and orderly fashion.

Therefore, MGM's Motion for Default Judgment should be granted.

### III.   Whether MGM has Proven Entitlement to Permanent Injunctive Relief & Damages

Having determined that default judgment should be entered, one issue remains: whether MGM has proven entitlement to injunctive relief and damages. Each is addressed below.

#### A.   *Permanent Injunctive Relief*

The court next considers whether it should award MGM a permanent injunction against Defendant. The Lanham Act "vests the district court with the power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the trademark owner." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137 (9th Cir. 2006) (citing 15 U.S.C. § 1116). A party seeking a permanent injunction must shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (citations omitted).

The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citation omitted).

A permanent injunction should be entered here. First, MGM has suffered an irreparable injury. In the trademark context, "once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 612 n. 3 (9th Cir. 1989). As discussed above, Defendant's website creates a likelihood of confusion.

Second, MGM has shown that remedies at law are inadequate. "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by defendants' continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).

Third, MGM has shown that the balance of hardships favors it. MGM has expended substantial sums of money using and promoting the MGM marks, and any harm to Defendant resulting from a permanent injunction that merely forces it to comply with the requirements of the law merits little to no equitable consideration. *See Burgess v. Gilman*, 475 F. Supp. 2d 1051, 1063 (D. Nev. 2007) aff'd, 316 F. App'x 542 (9th Cir. 2008) ("We further find that the balance of hardships tips in favor of CPS. The undisputed evidence is that Mr. Gilman has expended an extraordinary amount of money in anticipation of his planned use of the marks.").

Fourth, the public interest lies in favor of upholding property interests in trademarks and preventing customer confusion. *See Herb Reed*, 25 F. Supp. 3d at 1327 ("Finally, the public interest would be served by the injunction because it would enable the consuming public to distinguish between [the infringing and non-infringing products]").

**B.** *Monetary Damages*

Finally, the court considers whether MGM has demonstrated that it is entitled to monetary damages. "Statutory damages are appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed." *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1238 (E.D. Cal. 2008). The Lanham Act states that plaintiffs in cybersquatting cases may elect an award of statutory damages at any time before final judgment is rendered in the amount "not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

MGM seeks the statutory maximum for one infringing domain name. The court finds that MGM is entitled to the statutory maximum. MGM's complaint plausibly alleges that Defendant's acts of cybersquatting are willful. As discussed above, MGM began using the MGM mark in 1973. Defendant did not begin using the "imgm" domain name until 2013. Defendant knows it is violation MGM's right because Defendant was served with a summons and a complaint and continues to operate the webpage. Defendant knows it is violating MGM's rights because Defendant was served with a summons and a complaint and continues to advertise, promote, and sell its product through the infringing domain name.

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that MGM's Motion for Default Judgment and Permanent Injunction (#18) be GRANTED.

IT IS FURTHER RECOMMENDED that MGM be AWARDED the maximum statutory damages against Defendant in the amount of $100,000.00 and postjudgment interest on the principal sum at the judgment rate from the date of entry of the Judgment until paid in full.

IT IS FURTHER RECOMMENDED that Defendant be PERMANENTLY ENJOINED from (1) using the MGM mark (or any confusingly similar variations thereof) in commerce including on or in

connection with any Internet website or domain name and (2) registering or trafficking in any domain names containing the MGM mark or confusingly similar or dilutive variations thereof, alone or in combination with any other letters, words, letter strings, phrases or designs.

IT IS FURTHER RECOMMENDED that the infringing domain name—(*viz.*, <www.imgmcasino.com.com>)—be transferred to MGM and that Registrar.com, Inc. (the domain name registrar) and Verisign, Inc. (the .com registry) immediately transfer the registration for the <www.imgmcasino.com> domain name, currently registered to Mr. Chew, to MGM.

IT IS FURTHER RECOMMENDED that FINAL JUDGMENT be entered against Defendant.

IT IS SO RECOMMENDED.

### NOTICE

Pursuant to Local Rules IB 3-1 and IB 3-2, a party may object to orders and reports and recommendations issued by the magistrate judge. Objections must be in writing and filed with the Clerk of the Court within fourteen days. LR IB 3-1, 3-2. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 6th day of July, 2015.

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

23